LEIBSON, Appellee and Cross–Appellant,

v.

OHIO DEPARTMENT OF MENTAL RETARDATION AND DEVELOPMENTAL
DISABILITIES et al., Appellants; Schumacher, Cross–Appellee.

[Cite as *Leibson v. Ohio Dept. of Mental Retardation
& Dev. Disabilities* (1992), 84 Ohio App.3d 751.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 61099.

Decided Dec. 30, 1992.

*Elfvin & Besser* and *Bruce B. Elfvin,* for appellee and cross-appellant.

*Lee Fisher,* Attorney General, and *David J. Kovach,* Assistant Attorney General, for appellants and cross-appellee.

Patricia A. Blackmon, Judge.

This is an appeal from the Court of Common Pleas of Cuyahoga County. The Ohio Department of Mental Retardation and Developmental Disabilities et al.— defendants-appellants, hereinafter "ODMRDD"—timely appeal the trial court's grant of declaratory and injunctive relief to Jerome L. Leibson—plaintiff-appellee and cross-appellant. Leibson timely cross-appeals the trial court's judgment notwithstanding the plaintiff's verdict pursuant to Section 1983, Title 42, U.S.Code against Steven Schumacher—defendant and cross-appellee. For the reasons stated below, we affirm. The apposite facts follow.

In 1976, Leibson was employed by ODMRDD in a classified civil service position. In 1978, he was promoted to the unclassified civil service position of Health Administrator 2. Leibson's job responsibilities did not change, only his title and civil service status changed.

Upon acceptance of the promotion, he received a letter dated January 4, 1978, from F. Kay Alexander, Superintendent of the Warrensville Center where he worked, which he was required to sign. The letter provided in pertinent part that:

"As an individual placed in the Unclassified Service from a position in the Classified Service, you retain the right to resume a position and status comparable in compensation to the position previously held, should you be returned to the Classified Service."

Alexander, in a meeting, also assured him that if he was removed from the unclassified position for any reason, he would be placed in a back-up position in the classified service.

On November 17, 1982, Leibson was sent a letter from the personnel office of ODMRDD, informing him that he would be returned to the classified service.

On February 22, 1983, Leibson was sent a letter requesting that he submit his resignation and a request to be returned to classified service, so the director could appoint personnel of his choosing to Leibson's unclassified position. On February 25, 1983, Leibson sent a letter to the Director of ODMRDD expressing his desire to remain in his present position. On March 17, 1983, the director sent a letter to Leibson rescinding the request for his resignation.

In 1983, Leibson was reassigned to the Quality Assurance Office of ODMRDD, where he answered directly to a supervisor in Columbus, Ohio. He worked as a troubleshooter throughout the state, responding to problems in public and private facilities. He worked in this capacity until July 1986.

On July 10, 1986, he was sent a memo ordering him to return to Warrensville Developmental Center on July 28, 1986. He received the memo from Schumach-

er, who at the time was superintendent of the facility. The memo referred to Leibson's position as unclassified.

On August 24, 1988, Schumacher posted a memo to all staff informing them that there would be a reorganization of the Warrensville Developmental Center which would result in a very small number of layoffs. On the same day, Schumacher sent Leibson a letter informing him that he was contemplating abolishing his position and urging him to attend a meeting to discuss it. At the meeting, Schumacher told Leibson that his position would be abolished and no other position would be provided for him. Leibson's position was the only one targeted for abolishment.

On September 7, 1988, Schumacher sent Leibson a letter informing him that due to the job abolishment, he would be laid off effective September 26, 1988. He also received a packet of information. The packet included a form, which Leibson completed and returned. It indicated that he wished to exercise his bumping rights and re-employment rights.

On September 26, 1988, Leibson's layoff was pre-empted by the restraining order and subsequent injunction in this case. Leibson remained on the payroll; however, Schumacher did not give him any work assignments after the September 26, 1988 layoff attempt.

In March 1989, Schumacher left Warrensville Developmental Center and Alaric Sawyer replaced him as superintendent. Since Sawyer has been superintendent, Schumacher has been assigned work and has not turned down any assignments.

Leibson was aware that he was removed from the table of organization of the Warrensville Development Center after September 1988. As a result of the abolishment, he also filed a grievance. He grieved that his position was abolished because he was a union steward and because of his political affiliation with the Republican Party.

He was also aware, through his experience as a union steward, that the union contract did not mention R.C. 5123.08, nor did he receive any notice it was repealed or amended.

Upon abolishment of Leibson's job, the ODMRDD's office of personnel was never contacted to find him a back-up job. Paul Guthrie of the Office of Personnel believed, on the advice of the Attorney General's Office, that employees covered by the collective bargaining agreement were not protected under R.C. 5123.08.

Notwithstanding the Office of Personnel's interpretation of R.C. 5123.08, Schumacher never attempted to find Leibson a back-up position, nor did he consult anyone to find out what rights were available to Leibson.

His refusal to assign Leibson work after September 26, 1988, made Leibson feel that he had been injured:

"It's true, I've been paid in this time period, but I've had to live with the thought of one day losing the job, or having it resolved in court. Also, without having any job assignment given, my career was sort of put in limbo, so that is how it affected me."

On September 26, 1988, Leibson filed a complaint for declaratory and injunctive relief against ODMRDD to protect his rights to a back-up position under his classified civil service status pursuant to R.C. 5123.08. Leibson also alleged that Schumacher violated his civil rights under color of state law in violation of Section 1983, Title 42, U.S.Code and sought compensatory and punitive damages.

On the same day, the trial court granted Leibson a temporary restraining order. The order enjoined and restrained ODMRDD or Schumacher from abolishing Leibson's position. On October 27, 1988, the order was replaced by a preliminary injunction to remain in full force and effect until the final disposition of the case, or until further order of the court.

In support of the temporary restraining order and preliminary injunction, Leibson averred that: Mary Ellen Leibson, his wife, suffers from Lupus, and as a result is totally disabled and requires ongoing treatment. Zachary Leibson, his son, was struck in the eye by a rock and the injury has required two major surgeries and will require ongoing treatment. The loss of his job and medical benefits would cause harm to his family.

On May 29, 1990, a jury trial commenced with the issue of declaratory and injunctive relief tried to the bench. On June 1, 1990, the jury returned a verdict against Schumacher in favor of Leibson in the Section 1983 claim. The jury awarded $10,500 in compensatory damages and $7,000 in punitive damages.

On August 27, 1990, ODMRDD filed a motion for reconsideration and Schumacher filed a motion for judgment notwithstanding the verdict pursuant to Civ.R. 50.

On November 28, 1990, the trial court denied the motion for reconsideration, but granted the judgment notwithstanding the verdict, vacating the jury's award without explanation.

On that same day, the trial court granted Leibson declaratory relief and a permanent injunction against ODMRDD. The trial court permanently enjoined and restrained ODMRDD from abolishing Leibson's job without affording him all rights and benefits under R.C. 5123.08 and without affording him substantive due process as guaranteed under Section 1983, Title 42, U.S.Code and the Fourteenth Amendment to the Constitution of the United States.

■ Thereafter, this appeal and cross-appeal followed. ODMRDD's first assignment of error states:

"The trial court erred when it declared that R.C. 5123.08 applies to the abolishment of a position which, although occupied by an employee in the unclassified civil service of the state, was covered by a collective bargaining agreement."

This assignment has no merit.

ODMRDD argues that R.C. 5123.08 does not apply to positions of abolishment because the procedure for going from classified service to unclassified service is appointment and therefore dismissal from that appointment is "unfettered." This argument has absolutely no merit.

The notion that a person can be appointed from the classified service to the unclassified service and then dismissed summarily suggests a circumvention of the rights of classified employees. Under the ODMRDD's theory, any time it desires to terminate a classified employee, it need only promote the employee to an unclassified position and then dismiss the employee. Moreover, this theory is in direct contravention to the plain language of R.C. 5123.08, which provides:

"Any appointing officer may appoint a person holding a position in the classified service of the department of mental retardation and developmental disabilities to any position in the unclassified service of the department. *A person so appointed shall retain the right to resume the position and status held by him in the classified service immediately prior to his appointment.* If the position the person previously held has been placed in the unclassified service under this section, he shall be appointed to a position in the classified service that the director of administrative services certifies is comparable in compensation to the position the person previously held. Reinstatement to a position in the classified service shall be to a position substantially equal to that held previously, as certified by the director of administrative services. Service in the position in the unclassified service shall be counted as service in the position in the classified service held by the person immediately prior to his appointment to the position in the unclassified service. When a person is reinstated to a position in the classified service as provided in this section, he is entitled to all rights and emoluments accruing to the position during the time of his service in the position in the unclassified service." (Emphasis added.)

ODMRDD also argues that R.C. 5123.08 was superseded by the abolishment procedures of the collective bargaining agreement. This argument raises the issues of whether R.C. 5123.08 is specifically addressed in the collective bargaining agreement and whether there is a conflict between the statute and the agreement. We hold that R.C. 5123.08 imposes a mandatory duty upon

ODMRDD, absent a collective bargaining agreement entered into pursuant to R.C. Chapter 4117 which specifically excludes rights accrued under R.C. 5123.08.

R.C. 4117.10(A) provides in pertinent part:

"An agreement between a public employer and an exclusive representative entered into pursuant to this chapter governs the wages, hours, and terms and conditions of public employment covered by the agreement. * * * *Where no agreement exists or where an agreement makes no specification about a matter, the public employer and public employees are subject to all applicable state or local laws or ordinances pertaining to the wages, hours, and terms and conditions of employment for public employees.* * * * This chapter prevails over any and all other conflicting laws, resolutions, provisions, present or future, except as otherwise specified in this chapter or as otherwise specified by the general assembly. * * *" (Emphasis added.)

There is no dispute that the collective bargaining agreement under which Leibson is employed contains a section providing for layoff procedures. It provides for layoffs pursuant to R.C. 124.321 through 124.327 and Ohio Adm.Code 123:1–41–01 through 123:1–41–22 with certain modifications of its own, but notes no specification excluding rights accrued under R.C. 5123.08.

 Reclassification rights pursuant to R.C. 5123.08 are matters "pertaining to the wages, hours, and terms and conditions of employment for public employees." R.C. 4117.10(A). As such, R.C. 5123.08 imposes a mandatory duty on ODMRDD to provide a classified employee promoted to the unclassified service a "right to resume the position and status held by him in the classified service immediately prior to his appointment." See *State ex rel. Clark v. Greater Cleveland Regional Transit Auth.* (1990), 48 Ohio St.3d 19, 548 N.E.2d 940. In *Clark,* the Supreme Court of Ohio held that a statute, which pertains to wages, hours or terms and conditions of employment, imposes a mandatory duty on any political subdivision of the state, absent a collective bargaining agreement which specifically excludes rights accrued under that statute. *Id.* (R.C. 9.44, construed.) See, also, *Lakewood v. State Emp. Relations Bd.* (1990), 66 Ohio App.3d 387, 584 N.E.2d 70.

 In this case, Leibson brought with him pockets filled with benefits to which he was entitled under Ohio law. See *Lakewood.* The collective bargaining agreement governing Leibson's employment failed to specifically eliminate the benefits provided by R.C. 5123.08, and, thus, he retained entitlement to them. Furthermore, where a collective bargaining agreement does not specifically address a matter pertaining to wages, hours and terms and conditions of employment, no conflict exists. See *Clark,* 48 Ohio St.3d at 23, 548 N.E.2d at 943. Thus, Leibson retains his rights pursuant to R.C. 5123.08.

ODMRDD's second assignment of error states:

"To the extent that its permanent injunction constituted an adjudication that the appellants violated Leibson's Fourteenth Amendment right to due process of law, the trial court erred."

■ ODMRDD argues that the trial court's permanent injunction did not determine that Leibson's right to due process had been violated and, further, argues that it was not violated. This assignment is not well taken. The very nature of injunctive relief is prospective; and, therefore, this issue is not ripe for review.

We agree that the trial court's permanent injunction did not make any findings with respect to Leibson's Fourteenth Amendment right to substantive due process. It merely ordered that ODMRDD be permanently enjoined and restrained:

"From making job abolishment and layoff without according Plaintiff substantive due process protections afforded by Title 42 U.S.C. Section 1983 and the Fourteenth Amendment to the United States Constitution."

Thus, this assignment merely raises a potential controversy for which this court is restrained from making a premature declaration. See *Fortner v. Thomas* (1970), 22 Ohio St.2d 13, 14, 51 O.O.2d 35, 36, 257 N.E.2d 371, 372.

ODMRDD's third assignment of error states:

"The trial court abused its discretion when, because Leibson's wife and son needed continuing hospitalization insurance, it entered a preliminary injunction preventing the appellants from adversely affecting Leibson's employment."

■ ODMRDD argues that loss of employment does not form the basis of irreparable harm, notwithstanding the medical needs of Leibson's wife and son. This assignment has no merit.

"We recognize that cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found. Such extraordinary cases are hard to define in advance of their occurrence. We have held that an insufficiency of savings or difficulties in immediately obtaining other employment—external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself—will not support a finding of irreparable injury, however severely they may affect a particular individual. *But we do not wish to be understood as foreclosing relief in the genuinely extraordinary situation.* Use of the Court's injunctive power * * * should be reserved for that situation rather than employed in the routine case." (Emphasis added.) *Sampson v. Murray,* 415 U.S. 61, 92, 94 S.Ct. 937, 954, 39 L.Ed.2d 166, 187, fn. 68.

There is no dispute that the loss of employment in and of itself falls short of the type of irreparable injury necessary to support a preliminary injunction. See *Sampson, op. cit.* The loss of Leibson's medical benefits as a result of employment, however, is the type of extraordinary situation contemplated by the Supreme Court of the United States in *Sampson.*

To suggest, as ODMRDD has, that the trial court should have restrained ODMRDD from taking Leibson's medical benefits instead of his employment is not supported by the record. The medical benefits are a product of Leibson's employment and there is no evidence that they are severable; most medical benefits depend upon employee contribution and co-payments. Since the trial court's holding in this case represents a "genuinely extraordinary situation" as contemplated in *Sampson,* then distinguishing medical benefits from the employment itself is not necessary. Therefore, we find no abuse of discretion in the trial court's injunction.

Leibson's sole assignment of error states:

"The trial court erred in finding defendant Schumacher immune from a damage award based on qualified immunity and thereby granting defendant Schumacher's motion for judgment notwithstanding verdict and reversing the jury's damage award."

This assignment of error is not well taken.

Leibson argues that judgment notwithstanding the verdict, pursuant to Civ.R. 50(B), was improper because Schumacher waived qualified immunity when this case proceeded to trial. Schumacher is not entitled to qualified immunity and there was sufficient evidence to sustain the jury's verdict.

The question of whether Schumacher is entitled to qualified immunity and whether it is appealable depends largely upon an objective standard.

"The entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial. Accordingly, the reasoning that underlies the immediate appealability of an order denying absolute immunity indicates to us that the denial of qualified immunity should be similarly appealable: in each case [a pre-trial motion to dismiss or for summary judgment], the district court's decision is effectively unreviewable on appeal from a final judgment." (Emphasis sic.) *Mitchell v. Forsyth* (1985), 472 U.S. 511, 526–527, 105 S.Ct. 2806, 2815–2816, 86 L.Ed.2d 411, 425–426; *Harlow v. Fitzgerald* (1982), 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396.

In *Harlow,* the Supreme Court of the United States explained that "the subjective element of the good faith defense" of qualified immunity may prove to be incompatible with the nature of summary judgment. Civ.R. 56 requires that

disputed questions of fact ordinarily may not be decided on summary judgment. "And an official's subjective good faith has been considered to be a question of fact that some courts have required as inherently requiring resolution by a jury." *Id.,* 457 U.S. at 815–816, 102 S.Ct. at 2736, 73 L.Ed.2d at 408–409.

█ Qualified immunity shields government officials under the objective standard which tests whether their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known.

" * * * government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

" * * *

"On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed. If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors." (Footnotes omitted.) *Id.,* 457 U.S. at 818–819, 102 S.Ct. at 2738–2739, 73 L.Ed. at 410–411.

█ In this case, Schumacher asserted qualified immunity as a defense in his answer; however, he failed to assert it in his motion to dismiss and failed to file a motion for summary judgment. Therefore, it was effectively waived. See, also, *Cudlin v. Cudlin* (1990), 64 Ohio App.3d 249, 256–257, 580 N.E.2d 1170, 1174–1175.

Even if this court finds that qualified immunity was not waived, it must be judged in light of whether Schumacher proved that "he neither knew nor should have known of the relevant legal standard." *Harlow,* 457 U.S. at 819, 102 S.Ct. at 2739, 73 L.Ed.2d at 411.

█ In this case, it is clear R.C. 5123.08 was Leibson's clearly established legal right. There is also evidence that Schumacher failed to investigate what were Leibson's rights. In his position as superintendent, he knew or should have

known of those rights. Consequently, there is sufficient evidence to support the conclusion that Leibson was not entitled to qualified immunity.

We now turn to whether there was sufficient evidence to sustain the jury's verdict.

" 'The test to be applied by a trial court in ruling on a motion for judgment notwithstanding the verdict is the same test to be applied on a motion for a directed verdict. The evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. *Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon either of the above motions.*' (Emphasis added.)" *Posin v. A.B.C. Motor Court Hotel* (1976), 45 Ohio St.2d 271, 275, 74 O.O.2d 427, 430, 344 N.E.2d 334, 338, quoted in *Osler v. Lorain* (1986), 28 Ohio St.3d 345, 347, 28 OBR 410, 412, 504 N.E.2d 19, 22.

Sufficient evidence to support a claim of substantive due process under Section 1983 requires that the defendant acted "under color of state law," and deprived plaintiff of "rights, privileges, or immunities secured by the Constitution or laws of the United States." See, also, *Parratt v. Taylor* (1981), 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420, 428.

There is no dispute that Schumacher acted under color of state law and may be liable for it, in his individual capacity. *Hafer v. Melo* (1991), 502 U.S. ——, 112 S.Ct. 358, 116 L.Ed.2d 301. Therefore, the sole issue is whether Leibson was deprived of his rights, privileges or immunities secured by the Constitution or laws of the United States.

At issue in this case is Leibson's right to "due process of law" under the Fourteenth Amendment to the Constitution of the United States. There are three types of claims that may be brought pursuant to Section 1983 under the Due Process Clause of the Fourteenth Amendment. "First, the Clause incorporates many of the specific protections defined in the Bill of Rights. * * * Second, the Due Process Clause contains a [second] substantive component that bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.' * * *

"The Due Process Clause also encompasses a third type of protection, a guarantee of fair procedure." (Citations omitted.) *Zinermon v. Burch* (1990), 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100, 113. See, also, *Shirokey v. Marth* (1992), 63 Ohio St.3d 113, 119, 585 N.E.2d 407, 412.

Leibson's cause of action must come under the protection of procedural due process. A right to civil service employment created by state statute lacks substantive due process protection because it is not a "fundamental interest." See *Sutton v. Cleveland Bd. of Edn.* (C.A.6, 1992), 958 F.2d 1339 (state-created right to tenured employment lacked substantive due process protection). Property interests are not fundamental interests, inasmuch as they are not created by the Constitution of the United States. *Sutton* at 1348.

"Although property interests are not created by the Constitution but are created and defined by 'existing rules or understandings that stem from an independent source such as state law,' *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548, 561 (1972), the Supreme Court has held repeatedly that the property interest in a person's means of livelihood is one of the most significant that an individual can possess. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 543, 105 S.Ct. 1487, 1494, 84 L.Ed.2d 494, 504 (1985)." *Sutton* at 1348.

"Once it is determined that the due process clause applies, we are then faced with the question of what process is due * * * and * * * whether a federal cause of action is the appropriate remedy * * *." *Sutton* at 1349. Post-deprivation remedies may be adequate to satisfy claims of procedural due process, however, where pre-deprivation remedies are available, a different standard applies. Compare *Shirokey,* 63 Ohio St.3d at 122, 585 N.E.2d at 414, and *Sutton* at 1349.

A cause of action for procedural due process must attack the state's "corrective" judicial process as well as the "substantive wrong." See *Sutton* at 1349, citing *Vicory v. Walton* (C.A.6, 1983), 721 F.2d 1062, certiorari denied (1984), 469 U.S. 834, 105 S.Ct. 125, 83 L.Ed.2d 67. Pre-deprivation and post-deprivation remedies combined have been held to provide all the process that is due, even though abuses of pre-deprivation statutory rights may occur. *Sutton* at 1349. Such abuses are actionable under state law claims. *Greeley v. Miami Valley Maintenance Contrs., Inc.* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981.

In this case, Leibson was denied his right to pre-deprivation procedural due process pursuant to R.C. 5123.08, from the time Schumacher refused to give him work to the time Sawyer took over as superintendent. This abuse is actionable under *Greeley,* but not as a procedural due process claim. The right to procedural due process was ultimately satisfied by the post-deprivation relief provided by the trial court. The trial court's permanent injunction ultimately satisfied Leibson's right to procedural due process. Therefore, reasonable minds could only reach one conclusion; Leibson's right to procedural due process was satisfied and therefore the judgment notwithstanding the verdict was correct.

*Judgment affirmed.*

764

FRANCIS E. SWEENEY, P.J., concurs.

KRUPANSKY, J., dissents.